STATE of Missouri at the Relation of Nancy Corinne DYER and J. Raymond Dyer, Relators-Appellants,

v.

PUBLIC SERVICE COMMISSION of Missouri, Respondent,

Union Electric Company, Intervenor-Respondent.

No. 48085.

Supreme Court of Missouri,

Division No. 2.

Dec. 12, 1960.

Opinion Modified on Court's Own Motion Jan. 9, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 9, 1961.

J. Raymond Dyer, St. Louis, for appellants.

William H. Ferrell, John A. Woodbridge, Duane A. Patterson, St. Louis, for respondent Union Electric Co. Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, of counsel.

Glenn D. Evans, Gen. Counsel, Thomas J. Downey, Asst. Gen. Counsel, Jefferson City, for respondent Public Service Commission.

EAGER, Judge.

This appeal is one from a judgment affirming orders of the Public Service Commission made in a utility rate proceeding. The only parties appealing are J. Raymond Dyer and his daughter Nancy Corinne Dyer. On September 26, 1958, Union Electric Company filed its Consolidated Schedule of Rates for Electric Service, affecting Missouri, Illinois and Iowa. We are concerned, of course, only with the Missouri rates. The Missouri Commission issued its suspension orders on two different occasions, pending full hearings. Section 393.150 RSMo 1949, V.A.M.S.[1] Interventions were allowed on behalf of the City of St. Louis, the County of St. Louis, St. Louis Housing Authority, the cities of Brentwood and University City, League of Municipalities of St.

Louis County, and a group of seventeen large industrial power users located in Missouri. In addition to these, J. Raymond Dyer and his daughter were permitted to intervene. Dyer was a residence consumer and he and his daughter owned of record 225 shares of the common stock of Union Electric. During the lengthy hearings Dyer was permitted to cross-examine witnesses and adduce evidence. The record sent up by the Commission is voluminous, both in transcribed testimony and in exhibits. The hearings lasted intermittently from December 8, 1958 to May 15, 1959. We shall refer, when possible, to persons both individual and corporate by abbreviated names. Upon the filing of the petition for review Union Electric Company was allowed to intervene, and it has filed the only respondent's brief here. We shall refer to it as Union, to the Public Service Commission as the Commission, and to the Dyers, collectively, as Dyer.

We have considerable doubt of the right of Dyer to prosecute this appeal. Union has briefed this question, insisting that the appeal should be dismissed. Our statutes on the subject are not too clear, to say the least. Section 386.390, subd. 1 provides that "complaint may be made * * * by any corporation or person * * * by petition or complaint in writing, setting forth any act or thing * * * claimed to be in violation, of any provision of law, or of any rule or order or decision of the commission; provided, that no complaint shall be entertained by the commission, except upon its own motion, as to the reasonableness of any rates or charges of any gas, electrical, water or telephone corporation, unless the same be signed by the mayor or the president or chairman of the board of aldermen or a majority of the council, commission or other legislative body of any city, town, village or county, within which the alleged violation occurred, or not less than twenty-five consumers or purchasers, or prospective consumers or purchasers, of such gas, electricity, water or telephone service." A somewhat similar provision appears in §

1. All statutory references will be to this revision, unless otherwise indicated.

393.260. In State ex rel. Consumers Public Service Company v. Public Service Commission, Banc, 352 Mo. 905, 180 S.W.2d 40, 46 (involving a controversy between local utilities as to the control of a small territory) it was held that an "interested" (§ 386.500) party might apply for a rehearing or for review; also that "* * * the interest necessary to authorize intervention should be the same as that required to become a complainant * * *," presumably under § 386.390 (then § 5686, RS 1939); also, that it was never intended that every citizen might participate in any case. But it should be noted that the court was not dealing there with a rate case, which comes under the special proviso requiring complaint by a city, town, village or county or by twenty-five or more consumers. The current rules of the Commission on intervention are set out in Smith et al. v. Public Service Commission, Mo., 336 S.W.2d 491. They require, among other things, that an intervenor shall have an interest different from that of the general public. Dyer's interest here as a consumer appears to us to be no different from that of the members of the general public, but the Commission having made its rules may, we suppose, relax them. It would seem that intervention in this case could well have been denied under the terms of § 386.390 to any individual consumer or to a lesser number than twenty-five. The general consumer public was adequately represented. The Commission was, of course, proceeding more or less "upon its own motion," (having acted to suspend the rates) and we feel that it had some discretion as to the parties whom it should admit. It had already permitted seventeen large industrial consumers (less than twenty-five) to intervene, but we note that their interests were substantially different from those of the general public. However, the Commission has heard Mr. Dyer through a long and tiresome series of hearings, and, with some misgivings for the future, we decline to dismiss the appeal. We wish, however, to emphasize the proviso of § 386.390, quoted supra. The present appeal is a

good illustration of the wisdom of the legislature in declining, generally, to permit complaints (and appeals) by individual members of the public.

We shall attempt no review of the evidence, as such. It is long and complicated, and this appeal does not require, or merit, a full review. Such references as are necessary will be made in the opinion proper. The Commission made findings in considerable detail; these included a finding that the depreciated original cost of defendant's properties in Missouri as of the end of the test year (June 30, 1958) was $335,461,153; and that the current cost new, less estimated depreciation as of the same date, was $612,133,137. These figures were supported by voluminous evidence from Union's records and by the testimony of recognized experts. There was much testimony concerning the nature, extent and condition of Union's properties, valuations and methods of valuation, its capitalization, its working capital requirements, depreciation, the rates of return essential on utility properties upon different bases of valuation, the cost of capital both "historical" and current, the operating revenues and financial accounts of Union, and the projected results of the specific rate proposals. There was also much evidence concerning the increased operating costs experienced since the last rate increase was approved in September 1953, and of the past, present and future necessity for expansion of facilities and for the raising of new capital. A nationally recognized construction cost index was used in part to arrive at a "trended" current cost of the properties; this was explained and corroborated in large part by oral testimony. When the depreciated current cost new ($612,133,137) was increased by the value of materials and supplies on hand and certain other items, that figure became $616,-349,088. No figure was included in that cost base for cash working capital. The Commission found that the net operating revenue on the proposed rates for the test year would have been $21,504,957 (after

certain adjustments); on the original cost basis this would have afforded a return of 6.32%; on the (trended) current cost basis the return would have been 3.49%. The Commission further found that Union's existing rates "will not permit it to earn an amount sufficient to pay operating expenses, meet its fixed charges, provide a reasonable return on its common stock, maintain its credit and attract capital." It also found "that the application of the proposed rate schedule will not result in undue or unreasonable preferences nor subject any customer or class of customers to any undue or unreasonable prejudice or disadvantage, and that insofar as the rates prescribed by the proposed schedule define different classes of customers, localities and services and prescribe specific rates applicable to each such class, the schedule is just and reasonable." It found, in conclusion, that the *"fair value"* of Union's electric properties in Missouri as of June 30, 1958, was $409,500,000, and that the proposed operating income would yield on that rate base a return of 5.25% which the Commission found to be reasonable. The schedule was approved with one exception with which we are not concerned here; that involved the St. Louis Housing Authority. The rates, as approved, were estimated to produce an increase of $2,968,100 in operating income.

■ Appellants' points, though numerous, may fairly be reduced to the following: (1) that the Commission's decision was arbitrary and unreasonable in that it fixed a rate base calculated upon the *"fair value"* of Union's properties (an amount between the net original cost and the net reproduction cost), with no reasonable or logical basis therefor, and that the resulting rate of return is excessive; (2) that the approved schedule of rates discriminates against Union's domestic customers and in favor of its industrial customers; and (3), that certain expenditures computed as part of Union's operating expenses were not properly allowable. The first of these points raises (voluminously and with many

citations, both in point and otherwise) the oft-repeated argument that depreciated original cost, and not reproduction cost or fair value, is the proper method of fixing a base for utility rates. Dyer proposes either the original cost base, or the "prudent investment" base; we are not entirely sure which, but it makes no difference in our view. We do not propose here to be led again down this highly controversial road, for the matter has been fully considered and ruled upon in our very recent case of State ex rel. Missouri Water Company v. Public Service Commission, Mo., 308 S.W.2d 704, 717. There, after a full and very able discussion of the appropriate elements of rate making, and of the applicable statutes and authorities, the court determined that the Commission had acted unreasonably in excluding a consideration of the present "fair value" of relator's properties and that it must consider all the facts which "shed light on the question." The court discussed and rejected the contention now made that the provision in § 393.270, subd. 4, that the Commission shall have "due regard, * * * to a reasonable average return upon capital actually expended * * *" confines the Commission to actual cost in fixing a rate base. The conflicting theories and elements of rate making are fully discussed in that opinion, along with sundry applicable authorities, including many of those cited by appellants here. The case of Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, relied on so strongly by appellants here was analyzed and held not to require "abandonment of a rate base predicated upon present value * * *." Our court said, in part (308 S.W.2d loc. cit. 718–719): "This does not mean that such value must be based primarily upon either original cost or reproduction cost less depreciation. It was aptly said in Railroad Commission v. Houston Natural Gas Corp., Tex.Sup., 289 S.W.2d 559, 572: '[T]he original cost test deprives the equity ownership of any chance to fluctuate with changing economic condi-

tions and makes it in fact very like a fixed indebtedness instead of an equity ownership. On the other hand, the test of reproduction cost new adjusted to actual age and condition during inflationary periods could be too large a burden on the public and during deflationary periods unfair to utility investors. So the burden of the cases is that the solution falls as a matter of judgment somewhere between these two brackets. This allows utility property to fluctuate in value but tends to even out the curve and flatten the extremes of economic cycles.' * * * Consequently, we must and do hold that in determining the price to be charged for (in this instance) water (§ 393.270, Par. 4) the fair 'value of the property' of the water company which the Commission is empowered to ascertain under § 393.230, Par. 1, is a relevant factor for consideration in the establishment of just and reasonable rate schedules and must be considered in its proper relationship to all other facts that have a material bearing upon the establishment of 'fair and just' rates as contemplated by our statutes and decisions. State ex rel. City of St. Joseph v. Public Service Commission, 325 Mo. 209, 30 S.W.2d 8, 10; State ex rel. and to Use of City of St. Louis v. Public Service Commission, 326 Mo. 751, 34 S.W.2d 507, 510; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 601–602, 65 S.Ct. 829, 89 L.Ed. 1206." What appellants here really ask is that we now repudiate the Missouri Water Company opinion. We consider it to be a clear, logical and just decision and have no disposition to depart from it. The evidence here contains nothing which should distinguish the present case in principle from that case and its rulings are fully applicable. The Commission here has followed that ruling in arriving at a rate base, and its decision in so doing does not infringe any Constitutional or statutory requirements. It would be wholly superfluous for us to discuss each and all of the arguments made here; they have already been answered in the Water Company case, and the first contention is denied.

■■ Appellants say that the approved schedule of rates discriminates in favor of industrial consumers and against residential and commercial consumers. It is true that the increases allowed were somewhat higher, percentage wise, on the latter class than on the industrial; Dyer says that the rate "for residential consumers was increased 8.6% while the rate for industrial consumers was increased only 5.5%" (citing a Union witness as authority). Dyer's own bill was increased approximately thirty cents per month. There was much evidence indicating a proportionately larger increase in the cost of serving residential (and certain commercial) customers, as contrasted with industrial customers, due in large part to the immense use of air conditioning and the necessity of installing hundreds of miles of heavier wires, thousands of new and additional transformers and also new substations. In addition, it was shown that the labor costs incurred in serving this class of consumers was greater than that for industrial service. In recent years the peak load has shifted from winter to summer, largely due to air conditioning, so that a large capacity remains unproductive in the winter months. The Commission considered the evidence and contentions of all those representing residential consumers, and also the contrary evidence and contentions of the large power users; the latter insisted that no increase should be imposed upon them. The Commission found that the relatively higher increase to residential consumers (and so-called general service) was fair in view of the large capital expenditures and higher labor costs incurred and to be incurred on their behalf. On this evidence, and notwithstanding Dyer's protest that he does not use air conditioning, we do not find that the approval of the schedule by the Commission was, in this respect, arbitrary or unreasonable; and certainly it was supported by competent and substantial evidence. Classifications must be made ac-

cording to reasonable and practical groupings; thus, it was indicated that it would be wholly impractical to meter separately the current used in a residence for air conditioning and that used for lights and appliances. The rates fixed by the Commission are "prima facie lawful" (§ 386.270; State ex rel. City of St. Louis v. Public Service Commission, Banc, 329 Mo. 918, 47 S.W.2d 102) and the burden is upon the party seeking to set them aside. An unlawful discrimination has not been established here.

■■ The next point involves the supposed allowance of various expenditures of Union as part of its operating expenses. We say "supposed," because some of these are not disclosed adequately in the record. Dyer's position is that none of these is an ordinary and reasonable business expense. This contention is, in a measure, a subsequent chapter in Dyer's long feud with Union over proxy statements, examination of corporate records, proposed amendments of by-laws, and related matters. See: Dyer v. S.E.C., 8 Cir., 266 F.2d 33; Dyer v. S.E.C., 8 Cir., 251 F.2d 512; State ex rel. Dyer v. Union Electric Co., Mo.App., 309 S.W.2d 649; State ex rel. Dyer v. Union Electric Company, Mo.App., 312 S.W.2d 151; Dyer v. Union Electric Company, Mo.App., 318 S.W.2d 401. Dyer has the right and privilege to litigate, but some of his problems constitute no part of the issues in the present case. He claims here, more or less distinctly, that the following expenses should have been disallowed: (1) advertising expenses paid to a private utility power group (E.C.A.P.) for what Dyer refers to as "political propaganda" against public ownership of electric utilities; (2) expenditures for proxy solicitation and the defense of litigation concerning it; (3) "unlawful advertising and unlawful communications to stockholders"; and, (4) underwriters' fees supposedly paid in connection with an issue of common stock, and said to have been allowed as part of the "cost of attracting additional equity capital." We shall take these up in the order stated. (1) It appears that Union, during the test year, contributed to the cost of nine E.C.A.P. advertisements, at a total cost of $41,107.67; this amount was charged to administrative expense. Only one advertisement printed during the test year was in evidence. The Commission found that: "It is a recognized fact that the principal purpose of advertising is to create good public relations and stimulate a demand for the service or product being advertised, and the Commission is unable to find from the evidence offered that this particular form of advertising would do neither. In view of the fact that the Commission is of the opinion that management should control such expenditures as long as they are within the limits of reason, and in view of the fact that the Commission is unable to find that such advertising would not result in benefit to the rate payers, the expenses incurred therefor will be allowed." Appellants' objections to this ruling were raised in their motion for rehearing. It is doubtful, to say the least, if the Commission could logically have disallowed the entire year's expenditure upon viewing one advertisement. Dyer insists that the expense should be disallowed because he says it was disallowed by the Internal Revenue Department in auditing Union's income tax returns. The net result of the evidence on this score was that the field agent said that upon the information he had he could not allow the deduction, but it further appeared that there had been no final ruling. Such a ruling, even if properly shown, would not be binding upon our Commission in a rate case. Income tax rulings are based on specific departmental regulations. Dyer cites the Federal Power Commission's opinion in In re Alabama Power Company et al. (July 1959), 29 PUR 3d 209, as disallowing similar expenses. That case involved accounting procedure, not rates, although the ruling may eventually have had some indirect effect on rates; and it involved only nine of a total of twenty-six advertisements. What the Commission actually decided there was that these ad-

vertisements involved "matters of political controversy" which, under a fixed interpretation of the "Uniform System of Accounts," were made chargeable only in a certain manner. We have no similar provision applicable here, nor would such a ruling be binding upon our Commission in any event. Aside from all the foregoing, this contention involves an expense allowance of $41,107.67 against a total operating revenue of $21,504,957. The result of the allowance or disallowance of that item as an operating expense is almost infinitesimal, amounting to approximately .191 of one per cent. It would be rather ridiculous, we think, to overturn the decision of the Commission on such a point, and we decline to do so.

■ The next expense allowance complained of is that for proxy solicitation and the defense of litigation concerning it. Something of the history of this controversy may be gleaned from the opinions in Dyer v. S.E.C., 8 Cir., 266 F.2d 33, certiorari denied 361 U.S. 835, 80 S.Ct. 86, 4 L.Ed.2d 75; and Dyer v. S.E.C., 8 Cir., 251 F.2d 512, certiorari granted and cause remanded 359 U.S. 499, 79 S.Ct. 1115, 3 L.Ed. 2d 976. The solicitation expense was approximately $22,000, and that of litigation was approximately $43,000, both during the test year. We gather that all, or substantially all, of that litigation was instituted by Dyer. The first difficulty encountered on this point is that in Dyer's motion for rehearing, after a general assertion that the Commission's ruling allowing proxy solicitation expenses was "ultra vires," he confines himself specifically to references and argument concerning the 1957 proxy expense, which, as shown in 251 F.2d 512, supra, was incurred prior to March 21, 1957, for a meeting held on April 20, 1957. Those expenses were not incurred during the test year. The matter of the allowance of expense for proxy solicitation and litigation during the test year—July 1, 1957 to June 30, 1958,—has not been properly raised in the motion for rehearing and will not be considered further.

ther. Section 386.500, subd. 2; State ex rel. City of West Plains v. Public Service Commission, Mo., 310 S.W.2d 925, 934. We are precluded by statute from considering any ground not specifically set forth in the motion. If, by the reference to "ultra vires," Dyer means that the Federal Power Commission has the sole jurisdiction to rule upon the validity and allowance of proxy expense (and if we consider that allegation apart from the specific references), still there is no proper showing in this record that the Federal Power Commission has ever ruled upon the validity of any such expenses incurred during the test year. In Dyer v. S.E.C., 8 Cir., 266 F.2d 33, the content and scope, and not the expense, of proxy solicitation was the matter in question. The subpoint also made that the Commission improperly allowed expenses incurred for "unlawful advertising and unlawful communications to the stockholders," is nowhere mentioned in the motion for rehearing and we pass it without further comment.

A separate point deals with "underwriters' fees precursively allowed by the Public Service Commission * * * in determining the cost of attracting additional equity capital * * *." We are not certain that we fully understand Dyer's elucidation of this point. He seems to say that under Union's Articles and By-Laws its stockholders had or should have had pre-emptive rights, hence there was no occasion for any public issue of stock. That conclusion does not necessarily and logically follow from the premise. But be that as it may, all this apparently refers to a common stock issue of $30,000,000 made in 1959 after the entry of the Commission's Report and Order, and after the motion for rehearing was overruled. The stock issue appears to have been handled and approved in a separate, and subsequent proceeding before the Commission. There is no showing in our record of any allowance of underwriters' fees. The Commission did allow a rate of return which it felt would permit the company to attract new capital

as the needs should arise (and properly.so), but that general consideration will not permit us to upset its decision for some claimed allowance not shown in our record. Dyer has continually sought to inject the matter of pre-emptive rights to which he claims the stockholders should be entitled, and in his brief he argues many things (on this and other points) which in no wise appear in this record. We do not consider that this question is in any way involved here and now, and the Commission expressly declined to interfere with the action of management in that regard. The argument seems to be that if full pre-emptive rights were granted, there would be no need for public issues or underwriters' fees; that, we think, is strictly a non sequitur, but the relevancy of the whole point does not sufficiently appear here.

■ Dyer complains in one of his points of the exclusion of four exhibits. The matter is not elaborated in the argument. We may consider here, in a case tried as in equity, exhibits properly admissible, though initially excluded. We have examined these exhibits and find that all were properly excluded, either as hearsay or for immateriality. One of these was a letter to Dyer enclosing a "Press Release," one was a letter to Union stockholders outside the period of the test year, one was a bill introduced in but never enacted by the Missouri legislature, and one was an excerpt from the Congressional Record concerning E.C.A.P. advertising.

■ Other contentions and arguments have been advanced to such an extent that it is impossible to discuss them. They have been considered and are rejected. In conclusion, we remark that, if the present decision is so unfair and generally unlawful as Dyer claims, it would seem that some of the legally constituted guardians of the public interest would have pursued the matter further. However, having considered his appeal on the merits, albeit somewhat reluctantly, we have not let the minuteness of his own interests determine our ruling.

A large area of discretion is delegated to our Public Service Commission by law; many of its decisions necessarily rest largely in the exercise of a sound judgment. We do not substitute our judgment for that of the Commission. We determine whether its decision is unlawful, unreasonable, arbitrary, or not based on substantial and competent evidence. State ex rel. Hotel Continental v. Burton et al., Mo., 334 S.W.2d 75; State ex rel. City of West Plains v. Public Service Commission, Mo., Banc, 310 S.W.2d 925. We do not find that the decision here is unreasonable, arbitrary or unlawful, and we do find that it is supported by competent and substantial evidence. The judgment of the circuit court affirming the orders of the Commission is now affirmed.

All concur.