STATE of Missouri, ex rel., AMERICAN TELEPHONE & TELEGRAPH COMPANY, and AT & T Information Systems Inc., Relators/Appellants,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Southwestern Bell Telephone Company, and Office of Public Counsel of the State of Missouri, Defendants/Respondents.

No. WD 36158.

Missouri Court of Appeals, Western District.

Nov. 19, 1985.

Louis F. Bonacorsi, St. Louis, for relators/appellants.

Steven Dottheim, Michael C. Pendergast, Jefferson City, for Missouri Public Service Comm.

James E. Taylor, St. Louis, for Southwestern Bell.

Douglas M. Brooks, Jefferson City, for Office of Public Counsel.

Before LOWENSTEIN, P.J., and NUGENT and BERREY, JJ.

BERREY, Judge.

American Telephone and Telegraph Company (AT & T) and AT & T Information Systems (ATTIS) appeal from the decision of the Circuit Court of Cole County which affirmed an order of the Missouri Public Service Commission approving a tariff assessed against ATTIS for the use of certain embedded complex inside wiring owned by Southwestern Bell Company (SWB). Judgment affirmed.

The wire which is specifically at issue is referred to as embedded complex inside wire (CIW). CIW is "the telephone wire on a multi-access business customer's premises that connects all of the common equipment and terminals." The "common equipment" includes switchboards and key equipment; "terminals" are the telephone sets themselves. Common equipment and terminals are known collectively as "Customer Premises Equipment" (CPE).

Prior to 1981, the cost of installing CIW was charged to the business customer on a one-time basis at a price well below cost in order to expand services. The remaining expense was capitalized as an asset of the telephone company and depreciated over a period of time rather than expensed in the year of installation. In 1981 the Federal

Communications Commission (FCC) ordered that the cost of any new wire installation was to be expensed in the year the installations were made. *In re Uniform System of Accounts,* 85 F.C.C.2d 818, 828 (1981) (Docket 79–105). An enormous account for the CIW had been built up over the years, and the FCC order provided that this capitalized investment was to be recovered over a ten year period ending in 1991. *Id.* at 829.

In 1982, pursuant to the approval of a consent decree, AT & T was ordered to divest itself of its Bell Operating Company subsidiaries such as SWB. *See United States v. American Tel. and Tel. Co.,* 552 F.Supp. 131, 135–140 (D.D.C.1982), *aff'd. sub nom., Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), referred to herein as the Modification of Final Judgment (MFJ). AT & T was ordered to submit a Plan of Reorganization (POR) to the Department of Justice which was approved after limited modification. *See United States v. Western Electric Co., Inc.,* 569 F.Supp. 1057 (D.D.C. 1983), *summarily aff'd, California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). The POR contained a provision for the Bell Operating Companies to retain ownership of the CIW installed prior to the divestiture on January 1, 1984. Those companies also remained responsible for the recovery of the revenue requirement arising from the FCC order of 1981. Ownership of the CPE in existence at the time of divestiture was transferred to ATTIS.

To recover its historical investment, the telephone company (SWB) had previously been assessing a charge directly against those customers who used the CIW based on the number of station lines on the customers' premises. After divestiture, SWB would no longer have records of the customers' use of the wiring, but would have information regarding how much outside access wire was being fed into the common equipment. Thus, the problem arose as to how the revenue requirement was to be satisfied.

On February 1, 1983, SWB filed new tariffs, rates, tolls and charges for it and its future subsidiaries with the Missouri Public Service Commission (PSC). On July 25, 1983, the PSC granted SWB permission to file supplemental testimony wherein SWB proposed a new method for recovering the historical investment in CIW. SWB's annual revenue associated with CIW requirement at that time was $18,179,-000.00. SWB proposed recovering the investment by assessing a charge of $9.30 per month for each outside access line to which the business customer subscribed. However, the charge was to be collected from the CPE owner (ATTIS) and not the business customer. Because ownership of the CPE in existence prior to 1984 had been transferred to ATTIS, the charges would be collected almost exclusively from ATTIS. The PSC granted ATTIS' application to intervene.

The PSC conducted a hearing on the CIW issue beginning October 18, 1983. In support of its position SWB argued that it would no longer have any records of customers' use of the wire. SWB will know, however, how much access wire is fed into the common equipment, the switchboards and key equipment. SWB would no longer be installing new CIW nor maintaining existing CIW; its service personnel responsible for installation and maintenance of CIW were to be transferred to ATTIS. SWB argued that CIW is an "integral part of the terminal equipment" and it is "not directly connected to the Southwestern Bell network." SWB likened its position to that of a "wholesaler, so to speak, of a component part" who "wishes to sell or lease or impose rates for the use of complex inside wire upon the business entity that's in the business of assembling terminal equipment packages and marketing them to terminal equipment users." SWB referred to the general economic premise that the "cost causer has to be responsible for the cost recovery."

ATTIS countered that the PSC lacked authority to approve "an assessment of utility charges against someone who has

not requested and does not use the utility service." In support of its position, ATTIS argued it was not a user of the wire but rather ATTIS' customers who lease the equipment are users because they are provided the inside wire used to interconnect the equipment. The decision to use the wire already in existence on the premises is made by the customer. ATTIS set forth other potential problems with SWB's proposal including the creation of "serious administrative problems for the CPE owner which would ultimately result in additional expense to the consumer." Also, ATTIS argued that there is "no direct relationship between the number of access lines subscribed to and the amount of inside wire actually used by the CPE owner's customers causing small customers to pay more for the use of the same amount of inside wire as large customers;" that additional administrative costs will be incurred because the CPE owner will be required to pass the charges along to their customers; that there would be "an enhancement of the possibility that the existing network will be inefficiently utilized;" that CPE owners would be burdened with charges for costs for which they are not responsible; and that significant portions of the CIW will be stranded, thus making recovery of the historical investment even more difficult.

ATTIS presented its proposal in which the revenue requirement would be collected from the general body of ratepayers. If the $18.2 million were spread equally among all ratepayers, ATTIS' proposal would increase each individual's monthly bill by $.95. This increase would be *applicable regardless of whether or not the wire was present on the individual's premises.* Although ATTIS' proposal would cause the costs to be imposed upon those who are clearly not users of the wire, i.e., small businesses who have no switchboards or key equipment and residential customers, ATTIS continues to assert the order of the PSC is improper because ATTIS is not a user of CIW service.

The PSC issued its Report and Order—Part II, on December 20, 1983, wherein it found SWB's proposal to be just and reasonable. The PSC noted in its findings that the transfer of common and station equipment to ATTIS "without the transfer of the complex inside wire which serves the equipment will leave Southwestern Bell in the position of being interposed between the CPE supplier [ATTIS] and the supplier's customer." The PSC found that a charge "based upon the number of access lines leading to the common equipment is supported by the fact that there is a direct relationship between the number of access lines and the amount of wire used on the premises of a complex customer." The PSC also noted that any customer could avoid the charge by purchasing the existing wire from SWB or installing his own wiring.

AT & T and ATTIS filed a petition for writ of review with the Circuit Court of Cole County. Following oral arguments, the court affirmed the PSC's orders on July 2, 1984. AT & T and ATTIS appealed that decision to this court.

■ Appellants first argue that the PSC has no lawful authority to approve utility charges against the lessor [ATTIS] of appliances for the lessee's [CPE customers] consumption of utility services during operation of the appliances. Appellants assert that ATTIS is a private unregulated business which is under no obligation to provide public utility services and the PSC has neither the statutory nor constitutional power to authorize charges against the business.

It is true that the PSC is a creature of statute with powers limited to those conferred by the statute. *State ex rel. Utility Consumers Council v. Public Service Commission,* 585 S.W.2d 41, 49 (Mo. banc 1979). However, it is also true in this case that the PSC has acted within its authority by assessing charges against ATTIS.

The PSC is "vested with and possessed of the powers and duties in this chapter specified, and also all powers necessary or proper to enable it to carry out fully and effectually all the purposes of this chapter

[Chapter 386]." Section 386.040, RSMo 1978.[1] One of the PSC's duties is supervision of the telephone companies. Section 386.250.6. That duty includes determining "just and reasonable rates, charges and rentals" for the "rendering of service[s]." Section 392.240.

Appellants urge this court to narrowly construe the PSC's power as being limited to determining just and reasonable rates for services provided to customers. They cite section 386.020.17–18 which refers to "consumers or patrons" and argue that the subscriber to the wire service, the lessee of ATTIS' equipment, is the customer. In light of the statutory definition of "service," this court rejects appellants' theory.

Section 386.020.18 reads:

The term "service" when used in this chapter, is used in its *broadest and most inclusive sense and includes not only the use and accommodations afforded consumers or patrons,* but also any product or commodity furnished by any corporation, person or public utility and the plant, equipment, apparatus, appliances, property and facilities employed by any corporations, person or public utility in performing any service or in furnishing any product or commodity and devoted to the public purpose of such corporation, person or public utility, and to the use and accommodation of consumers or patrons.

With this in mind, the pivotal question becomes whether or not ATTIS is a "user" of complex inside wire (CIW).

The Kansas Court of Appeals recently found that ATTIS is a user of CIW and affirmed SWB's proposal to charge ATTIS for its use. *Application of Southwestern Bell Tel.,* 9 Kan.App.2d 525, 685 P.2d 304, 311 (1984). Although the Kansas decision has no legal effect on the Missouri Courts, this court agrees with the Kansas Court that "[u]se" does not have the narrow meaning ATTIS suggests. *Id.* 685 P.2d at 311.

The customer premises equipment (CPE) and the connecting complex inside wire (CIW) prior to divestiture were under one ownership. A witness for SWB, Mr. Barry, testified that CIW is an integral part of the entire system once owned by SWB and that the ownership operation of CPE services was responsible for the costs associated with the CIW. Specifically, Barry testified:

I think the cost is created by a customer ordering a system; and at the time that that system was provided in toto it was three component parts, and at that point in time the cost causer was a person who owned the system.

Now, we have pulled it apart and we've taken the two end pieces and sent them to a successor corporation, and the middle piece was left with Southwestern Bell. Now, I'm sitting here looking at the middle piece and I'm saying why does that middle piece exist, and my answer is that middle piece exists to make the two end pieces useful, and therefore, it is used or caused by the owner of the two end pieces.

. . . .

. . . [T]here is a new entity that heretofore did not exist, and they're in the business of leasing embedded PBX systems to a customer. That embedded PBX system includes a portion that I have to continue to own, complex inside wire. So the person who owns it, is leasing it, is making a profit off of it is ATTIS, and therefore I think they are under the new environment. I think they are the ones who are using that complex inside wire. They are using it to make a whole system, a valuable system which they then turnaround and lease to their new customer, my former customer.

It is clear from the evidence that ATTIS uses the CIW and is an appropriate party from which to collect the costs associated with the wire.

Appellants' argument that this decision will open Pandora's box by allowing electrical companies to assess charges against the

1. All statutory references are to RSMo 1978.

lessors of equipment which requires electricity for operation, is completely unrealistic. CIW is an integral part of an entire system having little, if any, independent value.

■ Appellants assert that PSC's order imposing the tariff violates the Supremacy Clause of the United States Constitution because it directly conflicts with the Modification of Final Judgment (MFJ) (divestiture) approved by the U.S. District Court for the District of Columbia. Appellants note that the MFJ forbids any acquisition of stock or assets of any Bell Operating Company by AT & T after divestiture. *American Tel. and Tel. Co. Inc., supra,* at 227. According to appellants, PSC's order would bring about a transfer of the CIW itself or a transfer of control of the CIW to ATTIS.

Upon motion for reconsideration of the CIW issue, the District Court for the District of Columbia rejected a request for the transfer of the wire to AT & T. The court stated, "To assign such wiring to AT & T would be to insert AT & T controlled facilities between the operating companies and the subscribers, and such an assignment would thus be entirely inconsistent with the basic purposes of the decree." *Western Electric Co., Inc., supra,* at 1129.

The basic purpose of the MFJ was to effectively prevent anticompetitive practices through structural reorganization. *American Tel. and Tel. Co., Inc., supra,* at 166. This basic purpose has not been frustrated. There has been no assignment, or order to buy the CIW. Rather, ATTIS has simply been instructed to pay for the use of the complex embedded wire. ATTIS cannot obtain a competitive edge as SWB may sell CIW to any purchaser, i.e., vendor, lessor, lessee.

■ Similarly, the appellants argue that PSC's order is inconsistent with and preempted by the FCC's order in Docket No. 81–893 in contravention of the Supremacy Clause as well as the Commerce Clause of the U.S. Constitution. ATTIS states that as a private vendor in an unregulated setting it may not be "forced" to recover the costs of CIW which will inevitably be passed on to its customers creating a compulsory transfer to ATTIS and that this charge would require extensive use of restricted proprietary information.

Appellants point in the order:
"intrasystem wiring correctly owned by AT & T or Independent Telephone Companies will not be detariffed and removed from regulated service. With respect to AT & T, we do not require any transfer or intrasystem wiring from BOC's to ATTIS." Implementation order, F.C.C. 83–551, Docket Order No. 81–893, p. 20, paragraph 21 (15).

This court, like the Kansas Court of Appeals, "does not find that the order effects a transfer of the wire, de facto or otherwise, to ATT–IS." *Application of Southwestern Bell Tel., supra,* 685 P.2d at 314.

It should be noted Order 81–893 further states that "[s]tate commissions will have a range of options available for the recovery of this investment under regulated service, and we find no reason to speculate here regarding whether any significant increases in basic exchange service rates will occur as result of the exercise of these options." F.C.C. Docket No. 81–893, Report and Order, p. 104–105, paragraph 165 FN. 140. PSC's order approving of the reduction of the historical investment through a tariff is within this "range of options." In addition, the FCC impliedly confirmed that any increase in the rates as a result of the tariff is solely left for the state's regulatory commission to consider.

Furthermore, the Customer Proprietary Information, the number of access lines subscribed to by each customer, is data that is already known to ATTIS as it actually installs, manages and maintains its own equipment leased to its customers.

The PSC's order does not, as the appellants suggest constitute an abdication of the Commission's duty to regulate the manner of recovery of a public utility revenue requirement prohibited by the Missouri Constitution. PSC has not delegated its

authority to ATTIS for the collection of these charges.

The statutes set forth in Chapter 386 and Chapter 392, RSMo 1978, provide a complete system for the regulation of public utilities. *Warner v. Southwestern Bell Telephone Co.*, 428 S.W.2d 596, 601 (Mo. 1968). In particular, section 392.220 states a telephone company such as SWB must file a schedule of its "rates, rentals and charges for [its] service." The PSC then must determine the rates charged by the telephone company for the services rendered. *See* section 392.240. In the instant case, the PSC simply used its rate making authority to allow SWB to assess a charge against ATTIS for its use of CIW.

No where in this system of regulation is the PSC allowed to regulate the method in which "consumers or patrons" retrieve such charges. If this court followed appellants' logic, the PSC would have to hear and determine the rates and charges that a business would assess their customers in order to establish a pricing system sufficient to recoup their utility expenses. *See Application of Southwestern Bell Telephone, supra*, 685 P.2d at 312. Therefore, how ATTIS bills for the cost is beyond the scope of the PSC's authority.

■ It is also appellants' position that the PSC's order constitutes an unlawful taking of their property without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 26 of the Missouri Constitution. In their application to the Commission for rehearing, however, the appellants did not "set forth *specifically* the ground or grounds on which [they consider] said order or decision to be unlawful, unjust or unreasonable." Section 386.500.2, RSMo 1978. In *State ex rel. Dyer v. Public Service Commission*, 341 S.W.2d 795, 801 (Mo.1960); *cert. denied*, 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 384 (1961), the court stated, "[w]e are precluded by statute from considering any ground not specifically set forth in the motion. Thus this court is without jurisdiction to rule on this point of error."

Paragraph nine in appellants' application for rehearing states "[t]he Commission's Report and Order, in the respects heretofore enumerated, violates Article I, Section 10, II & 1 and XI, Section 3 of the Missouri Constitution and Article VI, cl. 2 of [sic] and the Fourteenth Amendment to the United States Constitution." Article 1, Section 26, of the Missouri Constitution is not listed as grounds for constitutional attack. Furthermore, the appellants' reference to the Fourteenth Amendment of the Constitution certainly cannot be construed as asserting that there had been an unconstitutional taking in that (1) the payment of the charge for the wire in the CPE system it leases to its customers is without any corresponding reimbursement; (2) and the PSC's order forces ATTIS to engage in a business it has not chosen to enter. It is a step that would be unrealistic for this court to take. *See State ex rel. Dyer, supra; State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216, 220 (Mo.App.1973).

■ Appellants also contend the tariff arbitrarily classifies similarly situated parties resulting in unequal treatment and causes SWB's competitors to be unreasonably prejudiced and disadvantaged. Appellants allege a possible discriminatory impact in that a vendor who leases CPE attached to the CIW must pay the tariff whereas a vendor who sells CPE will not. Additionally, it is asserted that a tariff based on the number of access lines does not necessarily reflect the amount of wire the customer actually uses.

One of the chief goals of regulating public utilities "was to secure equality in service and in rates for all who needed or desired these services and who were similarly situated." *May Department Stores Co. v. Union Electric Light and Power Co.*, 341 Mo. 229, 107 S.W.2d 41, 49 (1937); *See Reinhold v. Fee Fee Truck Service*, 664 S.W.2d 599, 604 (Mo.App.1984).

This objective of the legislature is set forth in section 392.200.2 which states:

No telegraph corporation or telephone corporation shall directly or indirectly or

by any special rate, rebate, drawback or other device or method charge, demand, collect or receive from any person or corporation a greater or less compensation for any service rendered or to be rendered with respect to communication by telegraph or telephone or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect to communication by telegraph or telephone under the same or substantially the same circumstances and conditions.

This statute disallows the use of two or more rates for the same service; however, varying rates may be charged for a different character of service. *State ex rel. De-Paul Hospital School of Nursing v. Public Service Commission,* 464 S.W.2d 737, 739 (Mo.App.1971) (citing to *State ex rel. McKittrick v. Public Service Commission,* 352 Mo. 29, 175 S.W.2d 857, 866 (banc 1943). This variance must "be based upon a reasonable and fair difference in conditions which equitably and logically justifies a different rate." *State ex rel. City of St. Louis v. Public Service Commission,* 327 Mo. 318, 36 S.W.2d 947, 950 (1931).

In *City of St. Louis, supra,* an analogous situation arose and the court found no unjust discrimination. In that case, SWB's telephone service was being converted from a manually operated switchboard system to the automatic system in which intervention of the switchboard operator was unnecessary with the use of a dial. The dials were furnished free of charge to individual line subscribers and local switchboards with private branch exchange service (PBX) but a twenty-five cent charge was made for equipping dials on individual telephones attached to the PBX service. *Id.* 36 S.W.2d at 948.

Judge Cooley noted:

The individual line subscriber pays in his rate for direct access of the company's central office and to get it must have the dial on his telephone. The P.B.X. subscriber pays to his P.B.X. rate

for access through the instrumentality of his own operator, and is furnished a dial on the switchboard for the use of that operator, thus giving the subscriber the service to which his P.B.X. rate entitles him. No unlawful discrimination therefore exists because dials are furnished to individual line subscribers without extra charge and are not so provided for individual telephones of P.B.X. subscribers. *Id.* 36 S.W.2d at 950.

Similarly, a classification based on the ownership of the customer premises equipment (CPE) is not discriminatory. The vendor who sells the CPE no longer has an interest in the connecting wire; however, the vendor who leases the equipment continues to obtain a benefit from the use of the wire. This provides ample support for the charge based on this delineation. The Kansas Court of Appeals noted, "[t]he tariff applies uniformly to all who own equipment. The lessor who owns the equipment is subject to the tariff; when he sells the equipment and ceases to own it, he does not pay the tariff. The result is not discriminatory." *Application of Southwestern Bell Telephone, supra,* 685 P.2d at 314.

Appellants assert there is no correlation between the amount of wire a customer has and the number of access lines, the basis of the tariff charge. They argue small customers who have fewer terminals per access lines will "pay more for the use of equivalent amounts of wire than large customers." The evidence reveals that SWB does not possess the records containing the information concerning the amount of wire on the customer's premises. The records containing the number of access lines used by the customer is, however, within SWB's possession and provides information which is sufficient to support a charge for the use of the CIW.

Mr. Barry testified the number of stations gave a better indication of the amount of CIW being used; information not possess by SWB. He stated, however, the number of access lines reflected an estimate of the number of stations and that

"the more access lines you have the more stations you're going to have." "The general rule is that where more accurate information is unavailable estimates should be considered." *State ex rel. Martigney Creek Sewer Co. v. Public Service Commission*, 537 S.W.2d 388, 396 (Mo. banc 1976). Hence, there is competent and substantial evidence on the record as a whole to support the reasonableness of the charge although it is based on estimates. This court is without the authority to weigh the evidence presented and may not substitute its judgment for that of the commission where the order is based upon competent and substantial evidence. *State ex rel. Ashcroft v. Public Service Commission*, 674 S.W.2d 660, 662 (Mo.App.1984).

In furtherance of the argument that the charge has a discriminatory impact, appellants allege the charge had not been assessed against the appropriate cost causer because ATTIS was not in existence when the costs were realized. As previously noted, CIW is the nexus for the entire CPE system and ATTIS, a user of this link, may be properly assessed for that benefit. Appellants' reliance on *In re Southwestern Bell Telephone Co.*, 22 Mo. PSC 469 (1969), is misplaced because in that case a charge was being assessed where no corresponding service was provided.

This court also adopts the view of the Kansas Court of Appeals that allegations the tariff will create waste, inefficiency and degradation of the telephone service are merely speculative considerations and do not warrant further comment. *Application of Southwestern Bell Telephone, supra*, 685 P.2d at 312.

Appellants also maintain the PSC's order cannot be supported because the findings of fact were deficient as mere conclusory statements. In *State ex rel. St. Louis Public Service Co. v. Public Service Commission*, 365 Mo. 1032, 291 S.W.2d 95, 98 (Mo. banc 1956), section 536.090 of the Administrative Procedure Act was held to apply to the Missouri Public Service Commission and the requirement for the sufficiency of the findings of fact are set forth in *Glassnapp v. State Banking Board*, 545 S.W.2d 382, 386–387 (Mo.App.1976).

The court in *Glassnapp* stated the facts and the issues presented in each particular case will influence the degree to which an administrative agency details their findings. *Glassnapp, supra*, at 387. The *Glassnapp* court quoted:

The most reasonable and practical standard is to require that findings of fact be sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence.

(citing 2 Am.Jur.2d Administrative Law § 455, p. 268).

The PSC order details the function and history of the CIW and its relationship with CPE while describing the consequences of the divestiture. It explains the absence of SWB's role in installing and maintaining the CIW. The order describes the transfer of CPE to ATTIS without the corresponding transfer of the CIW leaving SWB "in a position of being interposed between the CPE supplier and the supplier's customer." Further discussion is made of the method and the records possessed and used by SWB in determining the charges for the use of the CIW to generate the needed revenue.

Appellants specifically argue PSC's finding is insufficient to understand the PSC's rationale on review. It states in part, "AT & T–IS raises a series of factual and legal arguments in opposition to Southwestern Bell's proposal. The Commission finds those arguments to be lacking in merit."

The PSC's rationale was implicitly provided concerning the appellant's challenge that this charge was unreasonable. As previously noted PSC's order stated, "The company's proposal that the monthly charge for the use of existing complex wire should be based upon the number of access lines leading to the common equipment is supported by the fact that there is a direct

relationship between the number of access lines and the amount of wire used on the premises of a complex customer." This reveals the PSC found the testimony of Mr. Barry to be credible and rational. Therefore, in the instant case the PSC's findings did not leave the reviewing court to speculate as to what part of the evidence the PSC believed and found to be true and what part it rejected. *Glassnapp, supra,* at 387; *Century State Bank v. State Banking Board of Missouri,* 523 S.W.2d 856, 859 (Mo.App.1975).

In addition because this court's review is limited, it may not substitute its judgment for that of the agency's. *Utility Consumers Council of Missouri, supra,* at 47. After reviewing all of the evidence, this court must only ask whether the findings could have been reasonably made and whether the decision was supported by competent and substantial evidence. *Id.* There is no question from the record and the PSC's order that they were acting upon a matter fully supported by competent and substantial evidence.

■ Appellants finally contend the PSC erred in admitting into evidence certain portions of Exhibit 192, the rebuttal testimony of Thomas Barry, a witness for SWB, and attached schedules, the correspondence between Zane E. Barnes, President of Southwestern Bell, and W.G. Sharwell and Bruce G. Schwartz, Vice President, Vice President-Business, respectively, for AT & T, because the evidence was irrelevant, conclusory and hearsay. Appellants also claim that Exhibit 193, requests for admissions directed to AT & T and AT & T information systems, and Exhibit 194, a data request to AT & T information systems and response, are irrelevant and should have been excluded from evidence. All the evidence in question concerns a proposal and an alleged agreement made by ATTIS in which ATTIS would be billed for the use of CIW.

First, portions of Exhibit 192, and all of Exhibits 193 and 194 are relevant to the issues in this case. Appellants cite *State ex rel. City of Sedelia v. Public Service*

*Commission,* 275 Mo. 201, 204 S.W. 497, 498 (1918) for the proposition that evidence proving the existence of an agreement to contract rates between private parties is irrelevant because private contractual rights may not influence PSC's rate making. In the *Sedelia* case, and others cited by appellants, the chief issue was whether a contract between private parties could "preclude the sovereign power of the state from fixing reasonable rates irrespective of the contract?" *Id.* at 498. This is not the question here.

Central to the instant case is whether the method of charging ATTIS for the use of SWB's CIW is just and reasonable. ATTIS proposal and potential contract for the use of the wire aided the PSC in making that determination. Evidence is relevant if it tends to prove or disprove a fact in issue or corroborates relevant evidence surrounding the main issue. *Aire v. Intertherm, Inc.,* 648 S.W.2d 142, 154 (Mo.App.1983).

In *State ex rel. General Telephone Company of the Midwest v. Public Service Commission,* 537 S.W.2d 655, 659 (Mo.App. 1976), the court stated that the Commission may ascertain every fact to determine whether the prices paid by Midwest to an affiliate supplier of telephone equipment were reasonable. The court in *Midwest* relied, in part, on section 392.270.1, RSMo 1969, which states, "the Commission shall have the power to ascertain the value of the property of every telegraph corporation and telephone corporation in this state and every fact which in its judgment may or does have any bearing in such value." The proposals and the alleged agreement are facts relevant to the Commissioner's determination of the value of the service, i.e., the use of the CIW property, and whether ATTIS is the entity that should be charged for the use of this "value."

■ Appellants also claim portions of Barry's testimony in Exhibit 192 contains hearsay and self-serving conclusions. Although Barry's testimony may allegedly embrace hearsay evidence, this evidence comes within a recognized exception to the hearsay rule: admissions against a party's

interest. *State ex rel. State Highway Commission v. Kimmell,* 435 S.W.2d 354, 360 (Mo.1968). An admission against a party's interest is any statement made by a party which is inconsistent with his contentions in the case. *McClanahan v. Deere & Co.,* 648 S.W.2d 222, 228 (Mo.App.1983).

The position of ATTIS during the hearing was that the charge was unreasonable and, as part of that contention, ATTIS is not a user of the CIW. According to ATTIS, Mr. Barry's testimony and attached schedules were inconsistent with this position. In addition, it is well established that an admission may bear on the issue incidentally and circumstantially and still be competent evidence. *White v. Burkeybile,* 386 S.W.2d 418, 422 (Mo.1965).

This court is not unmindful that conclusions may not be substituted for the proof of facts. *Rickard v. Rickard,* 428 S.W.2d 919, 928 (Mo.App.1968). Mr. Barry's testimony goes somewhat beyond merely relating the facts in proving the existence and terms of the agreement and makes conclusions of such. The Commission, however, because of its unique nature does not have to apply the technical rules of evidence "with the same force and vigor as in an action brought in a court of law." *State ex rel. Potashnick Truck Service, Inc. v. Public Service Commission,* 129 S.W.2d 69, 74 (Mo.App.1939), *See Hilke v. Firemen's Retirement System of St. Louis,* 441 S.W.2d 730, 732–733 (Mo.App.1969). The Commission had the facts upon which Mr. Barry apparently made his conclusory statements and there is no indication from the PSC's order that its decision was directly based upon the conclusions of Mr. Barry.

In addition to the contentions raised by ATTIS, SWB alleges that the PSC should have admitted Exhibits 195, 196 and 198 additionally offered by SWB to prove AT & T had initially agreed to pay SWB for the use of the CIW. This allegation was not properly raised by SWB in an application for rehearing with the PSC and this court is precluded from entertaining this matter. Section 386.500.2, RSMo 1978; *See State ex rel. Dyer, supra,* at 801.

The court finds the order of the PSC is supported by competent and substantial evidence and is not unreasonable, arbitrary or unlawful. The judgment is affirmed.

All concur.