**STATE of Missouri ex rel., SPRINT MISSOURI, INC., Appellant,**

**v.**

**PUBLIC SERVICE COMMISSION OF the STATE of Missouri, a State Agency, et al., Respondents.**

No. SC 86584.

Supreme Court of Missouri, En Banc.

June 14, 2005.

As Modified on Denial of Rehearing July 12, 2005.

---

Brett D. Leopold, Kenneth A. Schifman, Overland, KS, for appellant.

David A. Meyer, Associate General Counsel, Dana K. Joyce, General Counsel, Jefferson City, for respondents.

LAURA DENVIR STITH, Judge.

Sprint Missouri, Inc. (Sprint) appeals a judgment of the Circuit Court of Cole County affirming a decision of the Missouri Public Service Commission (PSC). The PSC rejected Sprint's proposed tariff establishing increased rates for certain nonbasic telecommunications services it provides to its customers on the basis that the proposed tariff exceeded the eight percent annual increase in rates permitted by section 392.245.11.[1] The PSC was correct in holding that section 392.245.11 prohibited Sprint from increasing the rate it charged its customers by more than eight percent annually. Accordingly, the judgment is affirmed.

## I. PSC REGULATION OF TELECOMMUNICATIONS RATES

The first PSC law regulating utilities was enacted in 1913. *State ex rel. Util. Consumers Council, Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41, 47 (Mo. banc 1979). The purpose of such regulatory laws is to allow a utility to recover a just and reasonable return while at the same time protecting the consumer from the natural monopoly power that the public utility might otherwise enjoy as the provider of a public necessity. *Id.*

Sprint is a large telecommunications company providing local exchange telecommunications services in Missouri and, as such, is subject to regulation by the PSC. *See* secs. 392.245, 392.250. Such regulation is premised on the belief that, where monopoly power exists, "competition is in-

---

1. All statutory references are to RSMo 2000 unless otherwise stated.

adequate to protect the public ... state regulation takes the place of and stands for competition ...". *May Dep't Stores, Co. v. Union Elec. L. & P. Co.,* 341 Mo. 299, 107 S.W.2d 41, 48 (1937) (internal citations omitted). Accordingly, under applicable PSC regulations, telecommunications companies such as Sprint traditionally have been permitted to raise the rates they charge consumers only by filing tariffs with the PSC that permit them to receive a certain rate of return, which then go into effect unless challenged by the PSC as unjust or unreasonable. *See* sec. 392.240.

Beginning in 1996, however, Missouri enacted legislation authorizing non-traditional, alternative telecommunications companies to begin providing basic local telecommunications service in competition with existing companies. Companies, such as Sprint, that already provided local service as of December 31, 1995, were classified as "incumbent local exchange telecommunications companies," or ILECs. Sec. 386.020.22, .30. The newly permitted and potentially competitive companies were classified as "alternative local exchange companies," or ALECs. Sec. 386.020.1. As noted in *State ex rel. Coffman v. Pub. Serv. Comm'n.,* 154 S.W.3d 316, 318 (Mo. App. W.D.2004), in order to permit existing service providers, or ILECs, to compete on a level playing field with the new entries into the local telecommunications area, or ALECs, Missouri enacted legislation that permits ILECs "the opportunity to gain freedom from traditional rate-of-return regulation" by enacting a system that would:

(3) Promote diversity in the supply of telecommunications services and products throughout the state of Missouri;

(4) Ensure that customers pay only reasonable charges for telecommunications service;

(5) Permit flexible regulation of competitive telecommunications companies and competitive telecommunications services;

(6) *Allow full and fair competition to function as a substitute for regulation when consistent with the protection of ratepayers and otherwise consistent with the public interest;*

Sec. 392.185 (emphasis added). Section 392.200.4(2) further expressly provides:

It is the intent of this act to bring the benefits of competition to all customers and to ensure that incumbent and alternative local exchange telecommunications companies have the opportunity to price and market telecommunications services to all prospective customers in any geographic area in which they compete.

*Id.* The legislature determined that the best way to permit such fair competition and to protect the ratepayer was to adopt a system permitting an ILEC to request that it be subject to "price cap regulation" under section 392.245 rather than traditional rate-of-return regulation under section 392.240 in geographic areas where the PSC certified that a competitive ALEC was operating in that area. *Coffman,* 154 S.W.3d at 318.

Of course, pursuant to section 392.245.1, the ILEC is still subject to the PSC's regulatory authority "to ensure that rates, charges, tolls and rentals for telecommunications services are just, reasonable and lawful." But, the PSC does so by means of "price cap regulation," which the statute defines as "establishment of maximum allowable prices for telecommunications services offered by an incumbent local exchange telecommunications company, which maximum allowable prices shall not be subject to increase except as otherwise provided in this section." Sec. 392.245.1.

Section 392.245.3 states that an ILEC's initial maximum allowable price is the price in effect on December 31st of the year preceding the year in which it became subject to price cap regulation. Because Sprint became subject to price cap regulation on August 19, 1999, its initial maximum allowable price was the price in effect on December 31, 1998.

## II. PRICE CAP REGULATION OF SPRINT'S RATES FOR MCA SERVICE

At issue here is Sprint's right to raise its maximum allowable price for a particular type of optional residential and business service called Metropolitan Calling Area, or MCA service, which allows consumers to call within an expanded metropolitan area for a set price per month. As this is a nonbasic telecommunications service, it is subject to price cap regulation under section 392.245.11, which provides in relevant part that:

> [T]he maximum allowable prices for nonbasic telecommunications services of an incumbent local exchange telecommunications company may be annually increased by up to eight percent for each of the following twelve-month periods upon providing notice to the commission and filing tariffs establishing the rates for such services in such exchanges at such maximum allowable prices.

*Id.* The parties agree that this section governs how and to what extent Sprint and other ILECs may increase their rates, but disagree as to its meaning and as to its application to Sprint's current attempt to increase the rates it charges customers for MCA services.

As relevant here, the record shows that, on December 11, 2000, Sprint filed a tariff that set out what Sprint called a "maximum allowable rate" for MCA service that was an eight percent increase over its previously charged rate. It is not clear what Sprint intended by the phrase "maximum allowable *rate*" because section 392.245.11, and related statutes, as discussed above, do not identify any such term, but rather provide for "maximum allowable prices" and "rates" actually charged. It is clear that Sprint did not actually file a tariff that raised the rates it actually charged for its MCA service, and those rates remained the same. The PSC approved the filing.

Twelve months later, Sprint again filed a tariff that set out what it again referred to as a "maximum allowable rate" for MCA service that was an eight percent increase over the hypothetical figure it had listed as the "maximum allowable rate" the preceding year. Again, Sprint did not file a tariff that raised the actual rates it charged customers for MCA service and those rates remained the same. Again, the PSC approved the filing.

On March 13, 2002, Sprint, for the first time since it had been subject to price cap regulation of its MCA rates, filed a revised tariff proposing an increase in the rates it charges its business and residential customers for MCA service. Its proposed tariff provided for a rate increase of 16 percent over its rates charged the prior year. The PSC rejected Sprint's proposed tariff on the basis that section 392.245.11 permits only an eight percent increase in rates per year above the "maximum allowable price" permitted by statute, and the maximum allowable price is based on the actual rates established for such services, not on a hypothetical "maximum allowable rate" that Sprint might have, but did not, charge customers. The circuit court affirmed the PSC's order. After opinion by the court of appeals, Western District, this Court granted transfer. Mo. Const. art. V, sec. 10

### III. STANDARD OF REVIEW OF PSC DECISION

 This Court reviews the findings and decision of the PSC, not the judgment of the circuit court. *State ex rel. Midwest Gas Users' Assoc. v. Pub. Serv. Comm'n,* 976 S.W.2d 485, 491 (Mo.App. W.D.1998). In so doing, this Court uses a two-part test. *State ex rel. AG Processing, Inc., v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 734 (Mo. banc 2003). First, the Court determines whether the PSC's order was lawful. *Id.* This turns on whether the PSC had the statutory authority to act as it did. *Id.* The PSC's order has the presumption of validity. *Util. Consumers Council v. Pub. Serv. Comm'n,* 585 S.W.2d at 47. Furthermore, the "interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *Foremost–McKesson, Inc. v. Davis,* 488 S.W.2d 193, 197 (Mo. banc 1972). Nonetheless, this Court exercises independent judgment and must correct erroneous interpretations of law. *Burlington N. R.R. v. Dir. of Revenue,* 785 S.W.2d 272, 273 (Mo. banc 1990).

Second, if this Court finds that the order is lawful, then it determines whether the order is reasonable. *AG Processing, Inc.,* 120 S.W.3d at 734. "In so doing, this Court determines whether the order was supported by substantial and competent evidence on the whole record, whether the decision was arbitrary, capricious, or unreasonable, or whether the PSC abused its discretion." *State ex rel. Mobile Home Estates, Inc. v. Pub. Serv. Comm'n,* 921 S.W.2d 5, 9 (Mo.App. W.D.1996).

 Missouri courts have long recognized that when the decision involves the exercise of regulatory discretion, the PSC is delegated a large amount of discretion, and "many of its decisions necessarily rest largely in the exercise of a sound judgment." *State ex rel. Dyer v. Pub. Serv. Comm'n,* 341 S.W.2d 795, 802 (Mo.1960), *cert. denied,* 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 384 (1961). "Under these circumstances, the reviewing court will not substitute its judgment for that of the PSC on issues within the realm of the agency's expertise." *Mobile Home Estates,* 921 S.W.2d at 10.

### IV. THE PSC'S ORDER WAS LAWFUL AND REASONABLE

 Section 392.245.11 governs the resolution of this case. As noted, it provides in relevant part that:

> [T]he *maximum allowable prices* for nonbasic telecommunications services of an incumbent local exchange telecommunications company *may be annually increased by up to eight percent for each of the following twelve-month periods* **upon** providing notice to the commission and **filing tariffs establishing the rates for such services in such exchanges at such maximum allowable prices.**

(emphasis added).

This language clearly supports the PSC's decision to disallow Sprint's proposed tariff. That tariff purported to raise the rate charged to customers for MCA service by 16 percent within a 12–month period, in direct contravention of the statutory requirement that increases be limited to "eight percent for each" 12–month period above the tariff establishing rates for such services for the preceding year.

Sprint admits that the tariff it filed purported to raise its actual rates 16 percent, but argues that because the proposed increase was only eight percent more than the hypothetical "maximum allowable rate" it had listed on its prior year's tariff filing, but never charged to any customer, the increase is permissible. In essence, Sprint argues that it should be allowed to "bank" the annual eight percent rate increases it

could have, but did not file, because otherwise it would be "forced" to increase rates by eight percent every year since it would lose that portion of the eight percent that it did not utilize in a particular year.

Sprint is incorrect. While Sprint did file tariffs with the PSC the preceding two years and did list in those tariffs what it called a "maximum allowable rate," the statute does not permit actual rate increases to be based on such hypothetical figures. To the contrary, the statute on its face states that an increase in the maximum allowable price is made by "providing notice to the commission and filing tariffs *establishing the rates for such services* in such exchanges *at such maximum allowable prices.*" Sec. 392.245.11 (emphasis added). In other words, *the statute states that in order to set a new maximum allowable price, the company must set its rates at the proposed new maximum allowable price, which cannot be more than an eight percent increase over the prior maximum allowable price.*[2]

Because, here, Sprint failed to increase rates in its 2000 or 2001 tariff filings, its maximum allowable price remained the same as it had been in the previous year. Consequently, when it sought to raise its rates in 2002, its right to such an increase in price was capped at an eight percent increase over its prior year's rate.

This holding need not, as Sprint claims, result in higher consumer prices because Sprint will choose to increase its rates by the full, statutorily permissible eight percent rather than holding rates steady or increasing them a smaller amount in some years. The statutory scheme is based on the premise that rates will be kept down, not by the eight percent statutory cap, but by competition. That is, even were Sprint to desire to increase its rates by eight percent each year, as a practical matter it will not be able to do so because ALECs in the area will be competing with it on price and will help hold down the rates it can competitively charge.

In the event that competition is not sufficient to keep down rates in the manner envisioned, however, the legislature has protected consumers by providing that rates can not increase by more than eight percent in any 12–month period, thus avoiding a rate shock increase that would only be subject to competitive regulation. It is this statutory cap on rate increases that gives the type of regulation its name—price cap regulation. The purpose of price cap regulation is not to guarantee Sprint an eight percent rate increase each year, but to *cap* increases at such an amount where competition does not otherwise cap them at a lower amount.

Further, the statutory framework clearly anticipates that increases may well be less than eight percent by providing that the new maximum allowable price may increase by *up to* eight percent annually, not that it is guaranteed to do so. In this way, price cap regulation can help the PSC meet its statutory duty of ensuring that ratepayers pay only reasonable charges for telecommunications services, while allowing companies to make a reasonable

---

2. Sprint argues that a contrary result is required because section 392.245.11 also provides that the PSC *shall* approve its tariffs within 30 days provided that they do not establish rates in excess of the maximum allowable price. But, that begs the question of what is the maximum allowable price. It is, as noted above, eight percent more than the rate previously charged. The portion of subdivision 392.245.11 Sprint cites merely provides that, once a company has filed a rate that sets a maximum allowable price, it may change the rates for its services—for instance, by lowering its rates—so long as the changed rates are also not more than the maximum allowable price established under the system described above.

profit, by permitting "flexible regulation of competitive telecommunications companies ... *and to allow full and fair competition to function as a substitute for regulation* when consistent with the protection of ratepayers and otherwise consistent with the public interest." Sec. 392.185 (emphasis added).

To interpret the statute otherwise would contravene its purpose. It would permit Sprint to "bank" the right to price increases, so that in any year when the competition envisioned by the legislature in enacting price cap regulation weakened, Sprint (or other ILECs) could avoid the effect of the rate savings resulting from past competition by increasing rates by the full amount of its "banked" price increases at one time, not just by the 16 percent requested here, but potentially by 24 percent, 36 percent, or more. This is not what the legislature intended when it amended chapter 392.

For these reasons, the Court holds that the maximum allowable price may be annually increased by up to eight percent. A company may chose not to increase up to the cap—indeed, if competition is working as anticipated, it may well not do so—but, in any case, the new base on which the next year's cap will be figured will be the actual rate charged as set out in the tariff.[3]

Accordingly, the PSC's order refusing to permit Sprint to increase its rate more than eight percent over its prior rate was lawful and reasonable. Affirmed.

All concur.

---

**3.** So, for example, if in year one the company charged a rate of $1.00, and it increased that rate to $1.04 in year two, then in year three it would be permitted to increase its rate by *up to* eight percent of $1.04. It could *not* increase its rate by up to eight percent of a hypothetical $1.08 that it could have but did not charge as its rate in year two.