**STATE ex rel. A.P. GREEN REFRACTORIES, INC., American Can Company, Chrysler Corporation, Dundee Cement Company, Ford Motor Company, General Motors Corporation, Mallinckrodt, Inc., McDonnell Douglas Corporation, Monsanto Company, Nooter Corporation, PPG Industries, Inc., Pea Ridge Ore Company, and St. Joe Minerals Corporation, Relators–Respondents,**

**and**

**State ex rel. Anheuser–Busch, Inc., Relator–Respondent,**

**v.**

**PUBLIC SERVICE COMMISSION OF the STATE OF MISSOURI, Respondent–Appellant.**

**No. WD 39610.**

Missouri Court of Appeals, Western District.

April 12, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1988.

Motion for Modification or Clarification of Opinion Denied May 31, 1988.

Application to Transfer Denied July 26, 1988.

Paul H. Gardner, Deputy Gen. Counsel, Jefferson City, for Public Service Comn.

Francis J. Hruby, St. Louis, for Anheuser–Busch, Inc.

Robert C. Johnson/George M. Pond, Peper, Martin, Jensen, Maichel and Hetlage, St. Louis, for A.P. Green Refractories, et al.

Before GAITAN, P.J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

In February 1984, Union Electric Company of St. Louis submitted proposed tariffs to the Public Service Commission reflecting increased rates for electric service provided to Missouri customers. The tariffs were designed to increase revenues by about $639,000,000. The increase was sought primarily to cover costs connected with the construction of the nuclear generator plant in Callaway County. The Commission issued its report and order by which it increased revenues by $652,382,000, with a phase-in of the increased rates over a period of eight years. Several industrial users intervened in the rate proceeding and after the Commission issued its order, they filed a petition for writ of review in the Circuit Court of Cole County. That court found that the Commission had failed to make findings of fact to support the method the Commission used in allocating costs to customers; found that certain conclusions were not supported by facts in the record; that the Commission erred in adopting the method of allocations supported by the Commission staff; that the fuel cost allocation was not supported by findings of fact; and that the elimination of the three-step declining block demand charge and the phasing in of Rider B credits and the refusal to amend Rider E were not supported by findings of fact. The Commission has appealed. Affirmed in part and reversed in part.

In its order and report, the Commission established the fair value rate base, i.e. the trended original cost less depreciation of UE's electrical property including the investment in the Callaway plant of $2,013,361,000. The Commission established the rate on equity that should be allowed to UE and from this determined the amount of the increase in rates that UE would need to charge to realize the allowed return on equity.

The Commission noted that this proceeding offered the Commission the first opportunity in a number of years to make a comprehensive assessment of the allocation of the total revenue requirements of UE to its customer classes and within those classes. This was the first rate proceeding conducted by the Commission in which the impact of the construction of the Callaway plant was considered. The Commission noted that the parties had made an issue of the proper cost of service method for assigning the total revenue requirement to the various classes of customers and within those classes. The classes of customers are 1) residential, 2) small general service, 3) large general service, 4) primary service, and 5) lighting.

The Commission stated that in order to perform a class cost of service study it is first necessary to functionilize costs into cost categories. The parties agreed that those categories are: 1) production, 2) transmission, 3) distribution, and 4) other costs. These allocation factors are used to allocate those costs which cannot be directly assigned to a customer class. The Commission found that it was those allocation factors which generated the primary controversy in this case.

The Commission found that the parties had very nearly agreed that the proper method to allocate costs should assign costs based upon cost causation as closely as practical. The Commission found that the parties had presented two basic theories concerning the causes of costs to UE and how those costs should be assigned to the customer classes and within each class. The Commission found that its staff and the public counsel had adopted the theory that the need for generating capacity is caused by the total system demand for electricity. UE and the Industrials adopted the theory that generating capacity is caused primarily by system peak demand. The Commission stated that the rate design in this case primarily involved the allocation of the production costs of the Callaway plant, and, for that reason, the major focus

of all of the arguments was upon production costs.

The Commission found that UE had performed eleven cost of service studies but that it did not propose any one of those as the proper method of allocating the cost of the Callaway plant. Rather, UE proposed that the Commission allocate the revenue requirement among the various customer classes on an equal percentage basis, except for lighting. The Staff developed its cost-of-service study. In its study, the Staff took the position that production capacity costs are caused by the total demand placed on the system which varies from hour to hour throughout the year. The Staff's method asserted that, theoretically the most correct approach to designing rates is a method that determines the production costs of meeting system demand in each hour of the year. Thus, there would be 8,760 (total hours in the year) power pools to be allocated to customer classes based upon the use of the system during each hourly pool. This method is described as the time-of-use (TOU) method. However, the Staff found that there was insufficient data to determine the hourly demand on the UE system and for that reason the Staff proposed a TOU/average-and-peak (AP) method, which it considered most closely approximates the preferable hourly TOU. The AP method allocates the monthly production costs to the classes based upon the class contribution to system average and to system peak demand.[1]

The Industrials proposed their method, which was referred to as the 2CP method. This method uses the two highest peaks on the system and is based upon the principle that the UE system is built to meet peak demands. The Industrials contended that UE only constructs new production capacity to meet system peaks. The Industrials' method allocates production costs to those that use the system during peak and provides that off-peak users should pay only energy costs. The Industrials contended that once UE had installed sufficient capacity to meet peak demands, the system could

---

**1.** Other factors were built into the staff method, but for the purpose of this opinion, it is not necessary to go into all of the details of the staff's proposed method.

be utilized to meet all other monthly demands without additional investment. The Industrials contend that the result of other methods of allocation costs would cause unfair rate increases to primary and large service class customers, in which categories the Industrials fall.

The evidence in support of the Staff method was introduced through the testimony of Dr. Michael Proctor, Manager of the Department of Research and Planning in the Utilities Division of the Commission. Dr. Proctor gave an extensive explanation of why he thought the TOU/AP method was the proper method for the Commission to adopt. UE, public counsel, and the Industrials also presented evidence concerning the method that they would have the Commission adopt. The Commission set out a chart in its order which compares the impact of the various methods upon the various classes of service. The main difference in the percentage of costs that would be paid by each class under the methods proposed by the Staff and the Industrials was in the residential and primary classes. In the Staff method, the residential users would pay 41.33% of the cost, and in the Industrials' method, that class would pay 47.83%. Under the Staff method, the general services class would pay 19.25% and under the Industrials' method, it would be 17.72%. In the Staff method, the primary class would pay 24%, and in the Industrials' method, that class would pay 19.96%. Other classes would be very nearly the same. It is apparent from this calculation that the Industrials' proposal would shift a greater percentage of cost to the residential users, which in turn would mean that the Industrials would pay a smaller percentage of the total cost.

The parties agree that the Commission is required to make findings of fact in its report which support its conclusions. *State ex rel. Monsanto Co. v. Public Service Commission,* 716 S.W.2d 791, 795 (Mo. banc 1986).

The court found the order in this case to be lacking in findings of fact because the Commission did not make findings of fact in adopting the TOU/AP method allocating production costs and because Dr. Proctor's testimony did not contain facts to support his method of allocation.

In *American Telephone & Telegraph Co. v. Public Service Commission,* 701 S.W.2d 745, 753[6] (Mo.App.1985), this court quoted from *Glasnapp v. State Banking Board,* 545 S.W.2d 382, 386–87 (Mo.App.1976), the applicable test for the sufficiency of findings of fact:

> The most reasonable and practical standard is to require that findings of fact be sufficiently definite and certain or specific under the circumstances of the particular case to enable the court to review the decision intelligently and ascertain if the facts afford a reasonable basis for the order without resorting to the evidence.

Here, the Commission adopted the theory presented by Staff that costs should be allocated on the TOU/AP method. The Commission undertook the task of choosing the theory to apply in fashioning a rate structure with the objective to determine which theory most reasonably reflects the causation of production costs. The Commission found that costs are caused by utilization of the system each hour, so the proper method of allocating costs is on an hourly basis.[2] The Commission also found that the use of 1989 load projections was reasonable because the use of 1985 data would cause the cost of Callaway to completely dominate the projections. In adopting the Staff theory, the Commission found against the Industrials' theory because it concluded Callaway was built to meet both base load and peak demand and its cost should be shared on that basis. In other words, the Commission found that Callaway was not built only to meet peak demand—a necessary premise in the Industrials' theory.

**2.** The Commission also found that it had adopted the TOU in a prior case. Contrary to the Industrials' argument, this was not viewed by the Commission in a sense of stare decisis but was stated as an additional reason for adopting that method in this case. There is nothing to indicate that the Commission felt bound by its prior decision.

The Commission also found against the Industrials' argument that peak demand is the proper theory to adopt. The Commission found that the Industrials' focus on the fixed nature of generation of capacity costs and that peak demand causes additional generation capacity. The Commission found that this approach does not determine what causes the costs and how they should be allocated. The Commission also made the following findings:

Industrials attack Staff's use of the 12–month costing period as not "real-world". The Commission finds that the 12–month costing period is a reasonable approach to allocating costs to the utilization of the UE system during the entire year. Staff's method looks to what types and how much generation capacity would be purchased to meet demands in every hour of the year if it is assumed no production plant exists at the beginning of the year. The use of the monthly costing data by Staff to determine the use of the UE system over a year is reasonable and the Commission finds this method most accurately reflects how the UE system is used. The Commission again finds that the 2CP method is not the appropriate method for allocating those costs.

 Here, the Commission was confronted with a choice of one of two theories for allocation of costs. The Commission made the basic finding that Callaway was built to meet both base load and peak demand. With this rejection of the Industrials' premise that the UE system was built to accommodate peak demand, the conclusion that costs should be allocated on the TOU/AP method follows. This was the essential finding to support the Commission order. The other findings flow from this basic fact. Such findings are sufficient for this court to review the decision to ascertain if those facts afford a reasonable basis for the order, without resorting to the evidence. This court finds that the facts found by the Commission provide a reasonable basis for the order.[3]

Dr. Proctor testified that the AP method was used as a surrogate for the pure TOU method. He described how monthly capacity costs were found and detailed how monthly loading factors were calculated for each plant and how these were used to determine the fraction of capacity costs related to average demand. He also made specific calculations for each UE generation plant so that he could determine what fraction of that plant's monthly capacity costs were related to average demand. This illustrates that Dr. Proctor's testimony was based on facts and was not solely opinion. Although the court erred in holding that Dr. Proctor's testimony was solely opinion and not based on facts, it should be noted that this court in *State ex rel. Associated Natural Gas Company v. Public Service Commission*, 706 S.W.2d 870, 878 (Mo.App.1985), upheld a Commission order supported by the testimony of a Staff witness based at least in part on theoretical assumption.

The court erred in finding that the Commission failed to make necessary findings of fact and in finding that the testimony of Dr. Proctor was based only on opinion, unsupported by underlying facts. The judgment on this issue will be reversed.

The Industrials also contend that the Commission failed to make findings of fact to support its adoption of fuel cost allocations. The Commission contends that this complaint was not raised in the petition for writ of review. In its petition, the Industrials complain that the Commission's order failed to even mention the issue of running cost allocations. The Commission had used the term running costs to include fuel cost. Thus, the Industrials did call to the attention of the Commission its failure to decide the issue of fuel cost allocations. The cause will be remanded for a finding on that issue.

The Industrials further contend that the Commission failed to make findings of fact to support its decision to eliminate the

---

**3.** The findings of fact are interspersed in the Commission's discussion of the theories advanced by the parties. The Commission may desire to adopt a format which sets out findings of fact separately to facilitate their easy identification.

**840**

three-step declining block demand charge. The Commission does not point out any findings of fact to support this decision, and the Industrials' contention must be sustained.

The Industrials contend that the order did not contain findings of fact in support of the decision to phase in Rider B credits. These credits were given to certain high voltage customers who own their own substation equipment. The Industrials proposed that the credits not be phased in with the phase-in of rates. The Commission decided the credits would be phased in but with no finding of fact. Only the conclusion was stated. This cause must be remanded for findings of fact on that issue.

The Industrials also contend that there were no findings of fact to support the refusal to amend the provision of Rider E. The Commission concedes that it failed to make findings of fact relative to that issue.

The judgment of the circuit court reversing the Commission's order on the issue of allocation of production costs is reversed, and the court is directed to affirm the Commission's order on that issue. The judgment reversing the Commission's order on the following issues: allocation of fuel costs, to eliminate the three-step declining block demand charge, the phase in of Rider B credits, and the refusal to amend Rider E is affirmed. This cause is remanded with direction to remand this cause to the Commission for findings of fact on those issues on which the judgment was reversed.[4]

All concur.

---

4. The Industrials have filed a motion to strike portions of the Commission's reply brief. The motion is denied.